**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| FEDEX SUPPLY CHAIN LOGISTICS AND ELECTRONICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> APKUDO, INC., <br><br> Defendant. | Civil Action No. 4:26-cv-396 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff FedEx Supply Chain Logistics and Electronics, Inc. ("FedEx Supply Chain" or "Plaintiff"), by its undersigned attorneys, for their Complaint for patent infringement against Defendant Apkudo, Inc. ("Apkudo" or "Defendant"), alleges as follows:

**THE PARTIES**

1. Plaintiff FedEx Supply Chain Logistics and Electronics, Inc. is a company organized under the laws of the State of Delaware, with its principal place of business in Memphis, Tennessee.

2. On information and belief, Defendant Apkudo, Inc. is a corporation organized under the laws of the State of Delaware, with a regular and established place of business located at 800 W Sandy Lake Road, #100, Coppell, TX 75019 and 2700 Regent Blvd., Irving, TX 75063. On information and belief, Defendant Apkudo may be served through its registered agent for service, The Corporation Trust Company, located at 1999 Bryan St #900, Dallas, TX 75201.

3. On information and belief, and described in more detail below, at least T-Mobile-USA, Inc. has contracted with or planned for Apkudo to provide its Device Passport Platform and AI-powered robotics as well as other device evaluation and reconditioning products and services

offered or used by Apkudo (collectively, the "Accused Products and Services") at 2700 Regent Blvd., Irving, TX 75063, a property leased by Assurant, Inc. On information and belief, Apkudo uses the Accused Products and Services at 2700 Regent Blvd., Irving, TX 75063, including the deployment, implementation, and maintenance of the Accused Products and Services by Apkudo employees.

## JURISDICTION AND VENUE

4. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, including §§ 271, 281, 283, 284, and 285. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. Defendant is subject to the specific personal jurisdiction of this Court because Plaintiff's patent infringement claims against Defendant specifically arise from acts of infringement by Defendant within the State of Texas.

6. Defendant is subject to general personal jurisdiction in this Court pursuant to due process and/or the Texas Long Arm Statute due at least to its substantial business in this State and Judicial District, including (a) at least part of its past infringing activities, (b) regularly doing or soliciting business in Texas, and/or (c) engaging in persistent conduct and/or deriving substantial revenue from goods and services provided to customers in Texas.

7. Venue is proper in this District under 28 U.S.C. § 1400(b). Defendant has committed and continues to commit acts of direct and/or indirect infringement in the Northern District of Texas at Defendant's regular and established places of business within this District at 2700 Regent Blvd., Irving, TX 75063 and 800 W Sandy Lake Road, #100, Coppell, TX 75019.

8. Defendant Apkudo has alleged in another lawsuit that "T-Mobile informed Apkudo that it would immediately start implementing device returns and processing services at Assurant's Texas facility (the 'Assurant Facility')" and when "T-Mobile unilaterally requested that Apkudo

begin supplying its products and services at Assurant's facility[,] . . . Apkudo agreed." *Apkudo, Inc. v. FedEx Supply Chain Logistics & Electronics, Inc.*, Case No. N25C-12-607 SKR CCLD, Dkt. No. 1 at 8-9 (Del. Super. Ct. Dec. 26, 2025). On information and belief, Apkudo's reference to "Assurant's Texas facility" is Defendant's regular and established place of business within this District at 2700 Regent Blvd., Irving, TX 75063. On information and belief, Apkudo employs one or more employees whose assigned work location is at or near 2700 Regent Blvd., Irving, TX 75063 and who conduct the business of Apkudo from this location, which is not its residence. Apkudo also has a regular and established place of business at 800 W Sandy Lake Road, #100, Coppell, TX 75019, which is listed on Apkudo's website as one of its "Offices":



(Screenshot taken from https://www.apkudo.com/about, March 31, 2026)

9.      Further, on information and belief, Apkudo employees have been and continue to be involved in the "deployment, implementation, or maintenance" of the Accused Products and Services at Defendant's regular and established place of business within this District at 2700 Regent Blvd., Irving, TX 75063.

### FEDEX SUPPLY CHAIN PIONEERS DEVICE RETURNS PROCESSING

10.      When electronic devices such as phones, tablets, and laptops reach the end of their lifecycle with a user, the user has options for how to dispose of the device: (1) sell, (2) destroy, or (3) refurbish. Among phones and tablets, cellular providers, such as T-Mobile, often accept such

4

devices in return for a trade-in credit or part of a promotional offer. When these devices are returned, it is important for the user's privacy that the user's personal information is removed. On the other hand, it is important for the cellular provider (or any other company accepting the device) to ensure that the device is operational and meets certain cosmetic conditions.

11.    FedEx Supply Chain has been in the business of processing device returns for over 10 years. For example, in 2014, T-Mobile entered into an agreement with FedEx Supply Chain's predecessor, ATC Logistics and Electronics, Inc., to handle T-Mobile's device returns. By this agreement, T-Mobile customers would return their devices to T-Mobile by first sending the devices to FedEx Supply Chain for processing. Once received, FedEx Supply Chain would perform functionality testing to ensure the devices are operational, remove any personal information, and inspect the devices to ensure they meet cosmetic standards.

12.    As a pioneer in device processing, FedEx Supply Chain created numerous methods and systems to more efficiently and effectively process returns. For example, FedEx Supply Chain created methods and systems to more efficiently and consistently (1) test the wireless and RF functionality of devices, (2) pick products for inspection, and (3) remove users' personal information. Indeed, FedEx Supply Chain received multiple patents on these methods and systems.

13.    On information and belief, these pioneering developments have been adopted by the Apkudo in this case either directly through interactions with FedEx Supply Chain or through other means. For example, FedEx Supply Chain and Apkudo executed a subcontract agreement in 2019 under which Apkudo agreed to provide device processing automation services and related software for the benefit of FedEx Supply Chain's customer, T-Mobile. A supplementation to the subcontract was executed in 2023. Under those Agreements, FedEx Supply Chain and Apkudo used FedEx Supply Chain's  patented software and equipment to handle, sort, test, clean and

process T-Mobile devices. Over the course of those many years, Apkudo learned FedEx's patented processes, systems, software, designs, techniques and other data that otherwise would likely have been unknown to Apkudo.

14. Armed with this knowledge, Apkudo then coordinated with Assurant to begin processing device returns for at least T-Mobile without FedEx Supply Chain's knowledge or participation. On information and belief, Apkudo has been and is currently processing these returns using FedEx Supply Chain's patented methods and systems at the Assurant facility in Irving, Texas. Apkudo is also believed to be using patented systems and methods at other facilities either independently or in cooperation with other entities.

## PATENTS-IN-SUIT

15. On May 10, 2016, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,335,360 ("the '360 Patent"), titled "Method for RF Testing Utilizing a Test Fixture." A true and correct copy of the '360 Patent is attached hereto as **Exhibit A**.

16. The '360 Patent relates to improvements to radio frequency testing of wireless devices. In the art, "[p]erforming tests for a wireless device or wireless device model may be time consuming and difficult because of different antenna pattern radiation, antenna positioning within each wireless device, and the necessity of repeating testing for multiple wireless devices." '360 Patent at 1:41–45.

17. The '360 Patent addresses these problems by providing specific techniques and implementations for radio frequency testing of wireless devices whereby "multiple tests for wireless devices may be carried out efficiently and consistently and with a high degree of accuracy for multiple wireless devices reducing costs, time, and difficulty." *Id.* at 3:25-29. For example, claim 1 of the '360 Patent describes a method for radio frequency testing where an RF antenna is received in a base plate of a test fixture, and an electronic device is positioned above the RF

antenna. *Id.* at cl. 1. "The test fixture may allow testing for a wireless device to be repeated by multiple parties (OEM, service provider, government entity)." *Id.* at 3:39-42. This ability to consistently reproduce RF testing is "important when important findings, such as compliance failures or communications failures are measured or tested." *Id.* at 3:43-45.

18.    On May 17, 2016, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,341,662 ("the '662 Patent"), titled "Method for Performing RF Testing." A true and correct copy of the '662 Patent is attached hereto as **Exhibit B**.

19.    The '662 Patent is related to the '360 Patent and similarly relates to improvements to radio frequency testing of wireless devices. In the art, "[p]erforming tests for a wireless device or wireless device model may be time consuming and difficult because of different antenna pattern radiation, antenna positioning within each wireless device, and the necessity of repeating testing for multiple wireless devices." '662 Patent at 1:33–37.

20.    The '662 Patent addresses these problems by providing specific techniques and implementations for radio frequency testing of wireless devices whereby "multiple tests for wireless devices may be carried out efficiently and consistently and with a high degree of accuracy for multiple wireless devices reducing costs, time, and difficulty." *Id.* at 3:18-22. For example, claim 1 of the '360 Patent describes a method for radio frequency testing of an electronic device where an RF antenna is received in a base plate that defines a grid of grooves, guides are received for securing the electronic device above the RF antenna, and the electronic device is secured and tested. '662 Patent, cl. 1. "The test fixture may allow testing for a wireless device to be repeated by multiple parties (OEM, service provider, government entity)." *Id.* at 3:32-35. This ability to

7

consistently reproduce RF testing is "important when important findings, such as compliance failures or communications failures are measured or tested." *Id.* at 3:36-38.

21.     On November 8, 2016, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,487,357 ("the '357 Patent"), titled "Method and Apparatus for Picking Products." A true and correct copy of the '357 Patent is attached hereto as **Exhibit C**.

22.     The '357 Patent relates to improvements to warehouse automation, including specific techniques and implementations for picking products from warehouse shelves and inspecting them. *Id.* at Abstract. The '357 Patent explains that "[r]aw material goods and manufactured goods (collectively "products") are often stored in a warehouse or a distribution center (collectively "warehouse") before the products are shipped out to suppliers, distributors, consumers, and businesses worldwide." *Id.* at 1:8-12. Before the '357 Patent, "[a]n employee, upon receiving instructions to retrieve the product, travels to the location of the warehouse where the product is stored, selects the product, and travels to a loading area of the warehouse, where the product is loaded onto a transportation vehicle and transported to another warehouse or to the purchaser." *Id.* at 1:20-25.

23.     To improve warehouse operation, the '357 Patent describes an automated vehicle that can "identify products stored on the shelves [], select products from the shelves [] arrange the products to form a product stack, [and] transport the products to the loading zone [] or another designated location." *Id.* at 3:20-26. The automated vehicle can also "perform an inspection" of the products "based on the condition of the product and the set of business rules." *Id.* at Abstract. The system further creates "a three dimensional virtual representation of the stack of products," which is called a "virtual stack" and that "has virtual dimensions that correspond to the physical dimensions of a physical stack." *Id.* at 5:11-14, 13:17-19.

24.     An example of such a robotic vehicle, which includes a robotic arm, a vision module, and sensors for identifying "conditions of product," is illustrated in FIG. 4 of the '357 Patent.  *Id.* at 11:34-44, FIG. 4.



25.     On February 21, 2017, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,575,973 ("the '973 Patent"), titled "System and Method for Systematically Removing Customer Personal Information from an Electronic Device." A true and correct copy of the '973 Patent is attached hereto as **Exhibit D**.

26.     The '973 Patent relates to improvements to technology involving electronic devices. The '973 Patent explains "the use of and development of communications has grown nearly exponentially in recent years" due to "larger networks, more reliable protocols, enhanced software functionality, and better communications hardware available to service providers and consumers." *Id.* at 1:34-38. "As a result, more people than ever are buying and using electronic devices," which means "the number of returns, repairs and refurbishments are at record levels

creating logistical problems." *Id.* at 38-42. Because "users may return electronic devices to an original equipment manufacturer (OEM), retailer, repair facility, service provider, or other entity," it is essential that "any electronic device that has been returned be cleared of all personal information, sensitive data, or other information linked to a previous user." *Id.* at 43-51. Otherwise, "[i]f the personal information is not removed, applicable laws, industry standards, and common business practices may be violated," including identity theft or other violations of privacy. *Id.* at 51-56.

27.     The '973 Patent addresses these problems. For example, the '973 Patent claims describe specific techniques and implementations that allow for more efficient and effective removal of customer private information ("CPI") from electronic devices, which prevent violation of applicable laws, industry standards, and common business practices, thus increasing the privacy of users.

28.     On March 20, 2018, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,921,923 ("the '923 Patent"), titled "Auditing Electronic Devices for Customer Personal Information." A true and correct copy of the '923 Patent is attached hereto as **Exhibit E**.

29.     The '923 Patent relates to improvements to technology involving electronic devices. The '923 Patent explains "use of and development of communications has grown nearly exponentially in recent years" due to "larger networks, more reliable protocols, enhanced software functionality, and better communications hardware available to service providers and consumers." *Id.* at 1:26-30. "As a result, more people than ever are buying and using electronic devices," which means "the number of returns, repairs and refurbishments are at record levels creating logistical problems." *Id.* at 30-34. Because "users may return electronic devices to an original equipment manufacturer (OEM), retailer, repair facility, service provider, or other entity," it is essential that

10

"any electronic device that has been returned be cleared of all personal information, sensitive data, or other information linked to a previous user." *Id.* at 35-43. Otherwise, "[i]f the personal information is not removed, applicable laws, industry standards, and common business practices may be violated," including identity theft or other violations of privacy. *Id.* at 43-48.

30.     The '923 Patent addresses these problems. For example, the '923 Patent claims describe devices capable of carrying out specific techniques and implementations that allow for more efficient and effective removal of CPI from electronic devices, which prevent violation of applicable laws, industry standards, and common business practices, thus increasing the privacy of users.

31.     On June 12, 2018, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,998,239 ("the '239 Patent"), titled "Automated Radio Frequency Testing Management System." A true and correct copy of the '239 Patent is attached hereto as **Exhibit F**.

32.     The '239 Patent relates to improvements to radio frequency testing of electronic devices. The '239 Patent explains that because of the "multitude of RF applications in the world, it is imperative that products and systems be electromagnetic compatible (EMC)." '239 Patent at 1:48–50. Devices must be tested in order to ensure that they are "able to operate in their electromagnetic environment without introducing intolerable electromagnetic disturbances back into the environment." *Id.* at 1:50–53.

33.     To solve these problems in the art, the '239 Patent's claims a specific automated radio frequency testing management system, a test station controller, and a method for performing automated radio frequency testing. However, the '239 Patent does not merely automate the testing process; instead, it provides a specific testing system. In the system, a database stores data related

11

to the automated testing; a test station comprises test station controllers that control radio frequency testing; and a server facilitates the communication between the two.

34.    The '360, '662, '357, '973, '923, and '239 Patents are collectively referred to herein as the "Patents-in-Suit."

35.    The claims of the Patents-in-Suit are valid, enforceable, and have not expired.

36.    FedEx Supply Chain is the assignee of all rights, title and interest in and to the Patents-in-Suit, including the right to sue and recover damages for infringement.

<u>**THE ACCUSED PRODUCTS AND SERVICES**</u>

37.    On information and belief, Defendant is currently making, using, selling, and/or offering for sale the Accused Products and Services, which embodies the technology claimed in the Patents-in-Suit.

38.    The Accused Products and Services includes Apkudo's Device Passport Platform and AI-powered robotics as well as other device evaluation and reconditioning products and services offered or used by Apkudo.

## Your complete solution

Apkudo's Device Passport Platform and AI-powered robotics, and experienced team provide the comprehensive solution you need.



### Intelligence

Gain actionable insights into liquidation, repair, quality, shipping, and packaging by ingesting and analyzing data from both internal and external sources. Generate comprehensive reports and dashboards, enabling you to make informed decisions and take action based on real-time data.



### Sustainability

Insights and reporting into the environmental impact of your unique device lifecycle program through reusing, reselling, and recycling assets-and saving e-waste materials from landfills.



### Support

Access the trusted guidance and additional support needed to make the most out of your Apkudo experience.

(Screenshot taken from https://www.apkudo.com/launch, March 31, 2026)

39.     According to Apkudo, its AI-powered robotics are capable of "process[ing] 250+ mobile devices per hour, without additional human interaction." https://www.apkudo.com/automation-line.



(Screenshot taken from https://www.apkudo.com/automation-line, March 31, 2026)

40.     According to Apkudo, its Device Passport Platform provides: (1) "real-time visibility and control over incoming and outgoing assets"; (2) "insights into every device, model, and partner in your ecosystem"; and (3) "a persistent, verifiable record of a device's entire lifecycle, from launch to end-of-life." https://www.apkudo.com/platform-overview.

14



(Screenshot taken from https://www.apkudo.com/platform-overview, March 31, 2026)

41.     On information and belief, Defendant has committed infringing acts without authorization, consent, permission or a license from the Plaintiff.

42.     On information and belief, Defendant has also induced and continues to induces infringement of the Patents-in-Suit pursuant to 35 U.S.C. § 271(b), by actively and knowingly inducing, directing, causing, and encouraging others, including, but not limited to, its customers and/or end users, to make, use, sell, and/or offer to sell in the United States the Accused Products and Services.

43.     On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the Patents-in-Suit. Defendant has actively encouraged, educated, and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to directly infringe the Patents-in-Suit. Defendant has acted and continues to act with the

15

specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the Patents-in-Suit. On information and belief, Defendant's inducement includes, for example, providing operational instructions, manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the Patents-in-Suit.

**COUNT I: PATENT INFRINGEMENT OF THE '360 PATENT**

44.     FedEx Supply Chain incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

45.     On information and belief, in violation of 35 U.S.C. § 271, Defendant has infringed, contributed to the infringement of, and induced others to infringe the '360 Patent, either literally or under the doctrine of equivalents, by, among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed systems and/or products in a manner that infringes at least Claim 1 of the '360 Patent. Such unlicensed systems and/or products include at least the Accused Products and Services.

46.     On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the '360 Patent. Defendant has actively encouraged, educated, and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to directly infringe the '360 Patent. Defendant has acted and continues to act with the specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the '360 Patent. On information and belief, Defendant's inducement includes, for example, providing operational instructions,

16

manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the '360 Patent.

47.    Claim 1 of the '360 Patent states as follows:

1.    A method for performing radio frequency (RF) testing of an electronic device comprising:

receiving an RF antenna in a base plate of a test fixture;

positioning the electronic device above the RF antenna, the electronic device being at least one of a computing device or telecommunications device configured for wireless communication; and

performing the RF testing.

48.    A chart demonstrating infringement of Claim 1 of the '360 Patent is attached hereto as **Exhibit G**.

49.    On information and belief, there are no substantial non-infringing uses of the Accused Products and Services.

50.    The claims of the '360 Patent are not abstract and are instead directed to a specific testing regime for particular types of devices using a base plate design where the electronic device is placed in a specific position to perform a specific form of testing.

51.    There are numerous techniques for testing electronic devices that are not within the scope of the claims of the '360 Patent.

52.    The claims of the '360 Patent contain numerous additional features that improve prior art processes for electronic device testing and transform the claims well away from any possible abstract idea.  For example, the use of a base plate is not required for wireless or RF testing but improves the repeatability and efficiency of a testing regime.  In further example, positioning the electronic device above an RF antenna in the base plate is a specific physical orientation  that is not a conventional nor well understood placement option in the art.

17

53.     At the time that the '360 patent was filed, the ordered combination of elements in the claims of the '360 Patent further provide a non-conventional and non-routine approach to wireless and RF testing of electronic devices.  The combination of elements set forth in the claims of the '360 patent were not conventional or routine at the time that the '360 patent was filed, as shown at least by the issuance of the '360 patent by the USPTO.

54.     Claim 1 of the '360 Patent is not representative of the other claims in the '360 Patent.

55.     Defendant has known of the '360 Patent since at least the filing of this Complaint.

56.     As a result of Defendant's infringement of the '360 Patent, FedEx Supply Chain has suffered and continues to suffer damages in an amount not yet determined.

57.     Defendant's infringement of the '360 Patent has been and continues to be willful, such that FedEx Supply Chain is entitled to enhanced damages and to recover its attorneys' fees and other expenses of litigation pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II: PATENT INFRINGEMENT OF THE '662 PATENT

58.     FedEx Supply Chain incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

59.     On information and belief, in violation of 35 U.S.C. § 271, Defendant has infringed, contributed to the infringement of, and induced others to infringe the '662 Patent, either literally or under the doctrine of equivalents, by, among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed systems and/or products in a manner that infringes at least Claim 1 of the '662 Patent. Such unlicensed systems and/or products include at least the Accused Products and Services.

60.     On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the '662 Patent. Defendant has actively encouraged, educated,

18

and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to directly infringe the '662 Patent. Defendant has acted and continues to act with the specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the '662 Patent. On information and belief, Defendant's inducement includes, for example, providing operational instructions, manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the '662 Patent.

61.     Claim 1 of the '662 Patent states as follows:

1.      A method for performing RF testing of an electronic device comprising:

receiving an RF antenna in a base plate, wherein the base plate defines a grid of grooves;

receiving one or more guides for connection to the base plate for securing the electronic device above the RF antenna; and

securing the electronic device on the base plate to perform the RF testing utilizing the one or more guides.

62.     A chart demonstrating infringement of Claim 1 of the '662 Patent is attached hereto as **Exhibit H**.

63.     On information and belief, there are no substantial non-infringing uses of the Accused Products and Services.

64.     The claims of the '662 Patent are not abstract and are instead directed to a specific testing regime for particular types of devices using a base plate design where the electronic device is placed in a specific position to perform a specific form of testing.

65.     There are numerous techniques for testing electronic devices that are not within the scope of the claims of the '662 Patent.

19

66. The claims of the '662 Patent contain numerous additional features that improve prior art processes for electronic device testing and transform the claims well away from any possible abstract idea. For example, the use of a base plate is not required for wireless or RF testing but improves the repeatability and efficiency of a testing regime. In further example, securing the electronic device on the base plate using one or more guides is a specific physical orientation that is not a conventional nor well understood placement option in the art.

67. At the time that the '662 patent was filed, the ordered combination of elements in the claims of the '662 Patent further provide a non-conventional and non-routine approach to wireless and RF testing of electronic devices. The combination of elements set forth in the claims of the '662 patent were not conventional or routine at the time that the '662 patent was filed, as shown at least by the issuance of the '662 patent by the USPTO.

68. Claim 1 of the '662 Patent is not representative of the other claims in the '662 Patent.

69. Defendant has known of the '662 Patent since at least the filing of this Complaint.

70. As a result of Defendant's infringement of the '662 Patent, FedEx Supply Chain has suffered and continues to suffer damages in an amount not yet determined.

71. Defendant's infringement of the '662 Patent has been and continues to be willful, such that FedEx Supply Chain is entitled to enhanced damages and to recover its attorneys' fees and other expenses of litigation pursuant to 35 U.S.C. §§ 284 and 285.

### COUNT III: PATENT INFRINGEMENT OF THE '357 PATENT

72. FedEx Supply Chain incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

73. On information and belief, in violation of 35 U.S.C. § 271, Defendant has infringed, contributed to the infringement of, and induced others to infringe the '357 Patent, either literally

20

or under the doctrine of equivalents, by, among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed systems and/or products in a manner that infringes at least Claim 1 of the '357 Patent. Such unlicensed systems and/or products include at least the Accused Products and Services.

74.     On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the '357 Patent. Defendant has actively encouraged, educated, and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to directly infringe the '357 Patent. Defendant has acted and continues to act with the specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the '357 Patent. On information and belief, Defendant's inducement includes, for example, providing operational instructions, manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the '357 Patent.

75.     Claim 1 of the '357 Patent states as follows:

1.      An apparatus for picking products, the apparatus comprising:

a machine-readable medium comprising:

a set of business rules for arranging at least one product of a work order into a virtual stack of at least one product, the at least one product having physical dimensions, the virtual stack being a three dimensional (3D) representation of the at least one product; and

a set of business rules for selecting each product of the at least one product;

a vision module comprising a sensor configured to identify one or more indications of a condition of each product of the at least one product;

a processor configured to perform an inspection of each product of the at least one product based on the condition of the product and the set of business rules for selecting the product; and

a robotic arm for:

selecting each product of the at least one product that has passed the inspection; and

arranging each product of the at least one product to form a physical stack based on the virtual stack.

76.    A chart demonstrating infringement of Claim 1 of the '357 Patent is attached hereto as **Exhibit I**.

77.    On information and belief, there are no substantial non-infringing uses of the Accused Products and Services.

78.    The claims of the '357 Patent are not abstract and are instead directed to a specific system for picking products from warehouse shelves and inspecting them based on a set of pre-defined rules.

79.    There are numerous techniques for picking products from warehouse shelves and inspecting them based on a set of pre-defined rules that are not within the scope of the claims of the '357 Patent.

80.    The claims of the '357 Patent contain numerous additional features that improve prior art processes for picking products and transform the claims well away from any possible abstract idea. For example, the use of a virtual stack being a three-dimensional representation of a product is not required for picking products but improves the repeatability and efficiency of picking products and determining the number of edges of the physical stack and the location of each edge of the physical stack.

81.    At the time that the '357 patent was filed, the ordered combination of elements in the claims of the '357 Patent further provide a non-conventional and non-routine approach to using a robot to pick, arrange and inspect electronic devices, e.g., by using business rules to arrange and inspect the devices. The combination of elements set forth in the claims of the '357 patent were

22

not conventional or routine at the time that the '357 patent was filed, as shown at least by the issuance of the '357 patent by the USPTO.

82. Claim 1 of the '357 Patent is not representative of the other claims in the '357 Patent.

83. Defendant has known of the '357 Patent since at least the filing of this Complaint.

84. As a result of Defendant's infringement of the '357 Patent, FedEx Supply Chain has suffered and continues to suffer damages in an amount not yet determined.

85. Defendant's infringement of the '357 Patent has been and continues to be willful, such that FedEx Supply Chain is entitled to enhanced damages and to recover its attorneys' fees and other expenses of litigation pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT IV: PATENT INFRINGEMENT OF THE '973 PATENT

86. FedEx Supply Chain incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

87. On information and belief, in violation of 35 U.S.C. § 271, Defendant has infringed, contributed to the infringement of, and induced others to infringe the '973 Patent, either literally or under the doctrine of equivalents, by, among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed systems and/or products in a manner that infringes at least Claim 1 of the '973 Patent. Such unlicensed systems and/or products include at least the Accused Products and Services.

88. On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the '973 Patent. Defendant has actively encouraged, educated, and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to

directly infringe the '973 Patent. Defendant has acted and continues to act with the specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the '973 Patent. On information and belief, Defendant's inducement includes, for example, providing operational instructions, manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the '973 Patent.

89. Claim 1 of the '973 Patent states as follows:

1. A method for flashing an electronic device, the method comprising:

establishing communication, by a computing device, with an electronic device, wherein the electronic device is in communication with the computing device using at least one of a wireless connection and a wired connection;

identifying, by the computing device, a make and model associated with the electronic device;

accessing, by a computing device, a flashing program stored on a network device; and

flashing, by the computing device, as instructed by the flashing program, the electronic device, wherein the flashing removes customer private information from the electronic device;

reporting the removal or non-removal of the customer private information on the electronic device to provide an audit trail;

performing trend analysis using the audit trail to identify issues with removing the customer private information from specific device types; and

reconfiguring the flashing program to more effectively remove the customer private information for future devices based on the identified issues.

90. A chart demonstrating infringement of Claim 1 of the '973 Patent is attached hereto as **Exhibit J**.

91. On information and belief, there are no substantial non-infringing uses of the Accused Products and Services.

92.    The claims of the '973 Patent are not abstract and are instead directed to a specific technique for removing customer private information from electronic devices and improving the efficiency of such removal.

93.    There are numerous techniques for removing customer private information from electronic devices that are not within the scope of the claims of the '973 Patent.

94.    The claims of the '973 Patent contain numerous additional features that improve prior art processes for removing customer private information from electronic devices and transform the claims well away from any possible abstract idea. For example, the use of audit trials to improve the efficiency of information removal is not required for removing customer private information from electronic devices but improves the repeatability and efficiency of removing customer private information from electronic devices.

95.    At the time that the '973 patent was filed, the ordered combination of elements in the claims of the '973 Patent further provide a non-conventional and non-routine approach to removing customer private information from electronic devices. The combination of elements set forth in the claims of the '973 patent were not conventional or routine at the time that the '973 patent was filed, as shown at least by the issuance of the '973 patent by the USPTO.

96.    Claim 1 of the '973 Patent is not representative of the other claims in the '973 Patent. For example, Claim 5 of the '973 Patent adds an additional inventive limitation that the removal of customer private information from electronic devices is performed automatically.

97.    Defendant has known of the '973 Patent since at least the filing of this Complaint.

98.    As a result of Defendant's infringement of the '973 Patent, FedEx Supply Chain has suffered and continues to suffer damages in an amount not yet determined.

99.     Defendant's infringement of the '973 Patent has been and continues to be willful, such that FedEx Supply Chain is entitled to enhanced damages and to recover its attorneys' fees and other expenses of litigation pursuant to 35 U.S.C. §§ 284 and 285.

### COUNT V: PATENT INFRINGEMENT OF THE '923 PATENT

100.     FedEx Supply Chain incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

101.     On information and belief, in violation of 35 U.S.C. § 271, Defendant has infringed, contributed to the infringement of, and induced others to infringe the '923 Patent, either literally or under the doctrine of equivalents, by, among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed systems and/or products in a manner that infringes at least Claim 1 of the '923 Patent. Such unlicensed systems and/or products include at least the Accused Products and Services.

102.     On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the '923 Patent. Defendant has actively encouraged, educated, and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to directly infringe the '923 Patent. Defendant has acted and continues to act with the specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the '923 Patent. On information and belief, Defendant's inducement includes, for example, providing operational instructions, manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the '923 Patent.

103.     Claim 1 of the '923 Patent states as follows:

1.    An auditing device for detecting customer personal information (CPI), the auditing device comprising:

a user interface for communicating information and receiving user input;

a plurality of interfaces operable to communicate with one or more electronic devices;

a memory operable to store a plurality of libraries providing information for detecting CPI on a plurality of electronic devices including a plurality of makes, models, and configurations; and

logic operable to utilize the plurality of libraries to:

detect, with the auditing device, CPI included on the one or more electronic devices communicating with the auditing device;

record, at the auditing device, an identification of an electronic device in an audit trail in response to detecting that the CPI is present on the electronic device, wherein the audit trail includes data on other electronic devices in which the auditing device previously detected that the CPI was present;

store, at the auditing device, an alert associated with the identification indicating that CPI is present on the electronic device;

perform, at the auditing device, trend analysis on the audit trail to indicate potential issues;

adjust, at the auditing device, the plurality of libraries to more effectively remove the CPI from electronic devices based on the trend analysis;

update, with the auditing device, a second plurality of libraries of a CPI removal system by communicating with a master auditing device in response to adjusting the plurality of libraries stored in the memory of the auditing device; and

remove, by the auditing device, the CPI included on an electronic device of the one or more electronic devices in response to determining that the CPI is present on the electronic device.

104.    A chart demonstrating infringement of Claim 1 of the '923 Patent is attached hereto as **Exhibit K**.

105.    On information and belief, there are no substantial non-infringing uses of the Accused Products and Services.

27

106. The claims of the '923 Patent are not abstract and are instead directed to a specific system for removing customer private information from electronic devices and improving the efficiency of such removal.

107. There are numerous systems for removing customer private information from electronic devices that are not within the scope of the claims of the '923 Patent.

108. The claims of the '923 Patent contain numerous additional features that improve prior art systems and processes for removing customer private information from electronic devices and transform the claims well away from any possible abstract idea. For example, the use of audit trials to improve the efficiency of information removal is not required for removing customer private information from electronic devices but improves the repeatability and efficiency of removing customer private information from electronic devices.

109. At the time that the '923 patent was filed, the ordered combination of elements in the claims of the '923 Patent further provide a non-conventional and non-routine approach to removing customer private information from electronic devices. The combination of elements set forth in the claims of the '923 patent were not conventional or routine at the time that the '360 patent was filed, as shown at least by the issuance of the '923 patent by the USPTO.

110. Claim 1 of the '923 Patent is not representative of the other claims in the '923 Patent.

111. Defendant has known of the '923 Patent since at least the filing of this Complaint.

112. As a result of Defendant's infringement of the '923 Patent, FedEx Supply Chain has suffered and continues to suffer damages in an amount not yet determined.

113.   Defendant's infringement of the '923 Patent has been and continues to be willful, such that FedEx Supply Chain is entitled to enhanced damages and to recover its attorneys' fees and other expenses of litigation pursuant to 35 U.S.C. §§ 284 and 285.

**COUNT VI: PATENT INFRINGEMENT OF THE '239 PATENT**

114.   FedEx Supply Chain incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

115.   On information and belief, in violation of 35 U.S.C. § 271, Defendant has infringed, contributed to the infringement of, and induced others to infringe the '239 Patent, either literally or under the doctrine of equivalents, by, among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed systems and/or products in a manner that infringes at least Claim 1 of the '239 Patent. Such unlicensed systems and/or products include at least the Accused Products and Services.

116.   On information and belief, Defendant's customers and/or end users have directly infringed and are directly infringing the '239 Patent. Defendant has actively encouraged, educated, and instructed its customers and/or end users to use the Accused Products and Services within the United States, and therefore Defendant has knowingly induced its customers and/or end users to directly infringe the '239 Patent. Defendant has acted and continues to act with the specific intent to encourage such infringement by customers and/or end users, and knowing that the induced acts by these customers and/or end users constitute infringement of the '239 Patent. On information and belief, Defendant's inducement includes, for example, providing operational instructions, manuals, technical specifications, demonstrations, training, and other forms of support and instructions that induce its customers and/or end users to directly infringe the '239 Patent.

117.   Claim 1 of the '239 Patent states as follows:

1.   An automated radio frequency testing management system comprising:

a database configured to store data for performing automated radio frequency testing on a plurality of electronic devices;

a server in network communication with the database, the server configured to provide an interface for configuring the automated radio frequency testing management system and retrieving test results, wherein configuring the automated radio frequency testing management system includes setting configuration parameters within the database; and

at least one test station in network communication with the database, the test station comprising a test station controller in communication with at least one radio frequency test set, wherein each radio frequency test set is configured with at least one test port configured with at least one radio frequency shield box, and wherein the test station controller is configured to receive data from the database to perform the automated radio frequency testing on the plurality of electronic devices; wherein the test station controller comprises:

a non-transitory computer-readable storage media having stored thereon computer-executable instructions; and

a processor for executing the computer-executable instructions, wherein the computer-executable instructions include instructions for:

enabling the test station controller to communicate over the network with the at least one radio frequency test set and the database;

controlling the at least one radio frequency test set to concurrently perform radio frequency testing of the plurality of electronic devices based on the data received from the database by determining whether an electronic device in the plurality corresponds to a currently configured model for the at least one test port; and

querying the database to receive the data for performing the radio frequency testing of the electronic device in the plurality under test based on identifying a model of the electronic device in the plurality under test.

118.   A chart demonstrating infringement of Claim 1 of the '239 Patent is attached hereto as **Exhibit L**.

119.   On information and belief, there are no substantial non-infringing uses of the Accused Products and Services.

120.   The claims of the '239 Patent are not abstract and are instead directed to a specific testing system for particular types of devices using a networked database and testing station in a specific configuration.

121.   There are numerous techniques for automated testing of electronic devices that are not within the scope of the claims of the '239 Patent.

122.   The claims of the '239 Patent contain numerous additional features that improve prior art processes for electronic device testing and transform the claims well away from any possible abstract idea. For example, the use of a networked test station controller is not required for wireless or RF testing but improves the efficiency of a testing regime.

123.   At the time that the '239 patent was filed, the ordered combination of elements in the claims of the '239 Patent further provide a non-conventional and non-routine approach to automated radio frequency testing of electronic devices.  The combination of elements set forth in the claims of the '239 patent were not conventional or routine at the time that the '239 patent was filed, as shown at least by the issuance of the '239 patent by the USPTO.

124.   Claim 1 of the '239 Patent is not representative of the other claims in the '239 Patent.

125.   Defendant has known of the '239 Patent since at least the filing of this Complaint.

126.   As a result of Defendant's infringement of the '239 Patent, FedEx Supply Chain has suffered and continues to suffer damages in an amount not yet determined.

127.   Defendant's infringement of the '239 Patent has been and continues to be willful, such that FedEx Supply Chain is entitled to enhanced damages and to recover its attorneys' fees and other expenses of litigation pursuant to 35 U.S.C. §§ 284 and 285.

## DEMAND FOR JURY TRIAL

128. Plaintiff hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

a. a judgment that Defendant has directly and/or indirectly infringed one or more claims of the Patents-in-Suit;

b. a permanent injunction against Defendant and its respective officers, directors, agents, branches, subsidiaries, parents, partners, and any others active in concert with Defendant from further infringement of the Patents-in-Suit;

c. a judgment and order requiring Defendant to pay Plaintiff past and future damages under 35 U.S.C. § 284, including any supplemental damages arising from any continuing post-verdict infringement between the time of the trial and entry of the final judgment with an accounting, as needed;

d. a judgment and order requiring Defendant to pay Plaintiff no less than reasonable royalties after the final judgment if a permanent injunction is not granted;

e. a judgment and order requiring Defendant to pay Plaintiff pre-judgment and post-judgment interest on any damages award;

f. a judgment and order that Defendant's infringement of the Patents-in-Suit be found willful and that the Court award treble damages pursuant to 35 U.S.C. § 284;

g. a judgment that this case is exceptional under 35 U.S.C. § 285 and an order that Defendant pay the Plaintiff their attorneys' fees incurred in prosecuting this action;

h. a judgment and order requiring Defendant to pay Plaintiff's costs and expenses incurred in this action; and

i. any further relief, including equitable relief, as the Court may deem just and proper.

Dated: April 1, 2026

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ David M. Hoffman*
    David M. Hoffman
    Texas Bar No. 24046084
    hoffman@fr.com
    111 Congress Avenue, Suite 2000
    Austin, TX 78701
    Tel: (512) 472-5070
    Fax: (512) 320-8935

    Ahmed J. Davis
    DC Bar No. 472321
    davis@fr.com
    1000 Maine Avenue, SW
    Washington, DC 20024
    Tel: (202) 783-5070
    Fax: (202) 783-2331

    Lance E. Wyatt
    Texas Bar No. 24093397
    wyatt@fr.com
    Riley J. Green
    Texas Bar No. 24131352
    rgreen@fr.com
    1717 Main Street, Suite 5000
    Dallas, TX 75201
    Tel: (214) 747-5070
    Fax: (214) 747-2091

**COUNSEL FOR PLAINTIFF,
FEDEX SUPPLY CHAIN LOGISTICS AND
ELECTRONICS, INC**