IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| FEDEX SUPPLY CHAIN LOGISTICS AND ELECTRONICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APKUDO, INC.,<br><br>Defendant | Civil Action No. 3:26-cv-01416-L-BW |

**BRIEF IN SUPPORT OF DEFENDANT APKUDO, INC.'S MOTION TO PARTIALLY DISMISS THE FIRST AMENDED COMPLAINT**

**Use of Generative Artificial Intelligence**

Generative artificial intelligence was used in the preparation of this brief, including for legal research and for the review and editing of drafts. Every citation and quotation in this brief was independently verified by counsel against the cited authority before filing. Counsel will identify the specific portions of the brief prepared with the assistance of generative artificial intelligence if the Court so directs.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

A. The First Amended Complaint ........ 1

B. The Specification and Claim 1 of the ‘973 Patent ........ 2

C. The Specification and Claim 1 of the ‘923 Patent ........ 4

D. The Specification and Claims of the ‘488 Patent ........ 6

E. The Specification and Claims of the ‘017 Patent ........ 8

II. LEGAL STANDARD ........ 10

A. Motions to Dismiss ........ 10

B. The Two-Step “Alice” Analysis for Patent Eligibility Under Section 101 ........ 11

1. *Alice* Step One ........ 12

2. *Alice* Step Two ........ 13

C. Eligibility Is Properly Decided on the Pleadings, and No Claim Construction Is Required ........ 14

III. COUNTS IV, V, VII, AND VIII OF THE FAC SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THE ASSERTED PATENT CLAIMS RECITE INELIGIBLE SUBJECT MATTER UNDER § 101 ........ 14

A. The ‘973 Patent Claims Ineligible Subject Matter (Count IV) ........ 14

1. Claim 1 of the ‘973 Patent is Directed to An Abstract Idea ........ 14

2. Claim 1 of the ‘973 Patent Does not Include an “Inventive Concept” or Anything “Significantly More” Than an Abstract Idea ........ 18

B. The ‘923 Patent Claims Ineligible Subject Matter (Count V) ........ 19

1. *Alice* Step One....................19

2. *Alice* Step Two....................21

C. The ‘488 Patent Claims Ineligible Subject Matter (Count VII)....................21

D. The ‘017 Patent Claims Ineligible Subject Matter (Count VIII)....................22

IV. CONCLUSION....................23

# TABLE OF AUTHORITIES

## CASES

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) ................14

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) ........6

*Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ........................................................ passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................10

*Authentixx LLC v. Pickleball OpCo LLC*, No. 3:25-cv-1599-B, 2026 WL 1847456 (N.D. Tex. June 26, 2026)..........................................................................................11

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012) ..........................................................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..........................................................10

*Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350 (Fed. Cir. 2024)..........................................16, 19

*Briggs v. Mississippi*, 331 F.3d 499 (5th Cir. 2003)..........................................................11

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018).................................. passim

*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020)..........................................12

*Constellation Designs, LLC v. LG Elecs. Inc.*, No. 2024-1822, 2026 WL 2561781 (Fed. Cir. Aug. 31, 2026) .......................................................................................... passim

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) ...........................18

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256 (Fed. Cir. 2018)................................10

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016)..............................................12

*GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053 (Fed. Cir. 2026)............................. passim

*Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015) ......17, 20

*Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335 (Fed. Cir. 2018)........................................12

*Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004) ... 11

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ... 11

*Magnacross LLC v. OKI Data Ams., Inc.*, No. 3:20-cv-01959-M, 2022 WL 992595 (N.D. Tex. Mar. 31, 2022) ... 17

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) ... 12, 19

*PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310 (Fed. Cir. 2021) ... 18

*Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205 (Fed. Cir. 2025) ... 11

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465 (5th Cir. 2010) ... 11

*Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698 (Fed. Cir. 2023) ... passim

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311 (Fed. Cir. 2015) ... 11

*Thales Visionix Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017) ... 12

*Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355 (Fed. Cir. 2023) ... 18

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017) ... passim

*Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017) ... 17

**STATUTES**

35 U.S.C. § 101 ... 1, 11, 14

**RULES**

Fed. R. Civ. P. 12(b)(6) ... 10, 11, 14

Fed. R. Civ. P. 12(c) ... 11

# I. INTRODUCTION

Defendant Apkudo, Inc., ("Apkudo") hereby moves to dismiss Counts IV, V, VII, and VIII of Plaintiff FedEx Supply Chain Logistics and Electronics, Inc.'s ("FedEx" or "Plaintiff") First Amended Complaint ("FAC"). Count IV asserts that Apkudo infringes U.S. Patent No. 9,575,973 (the "'973 Patent"). Count V asserts that Apkudo infringes U.S. Patent No. 9,921,923 (the "'923 Patent"). Count VII asserts that Apkudo infringes U.S. Patent No. 9,311,488 (the "'488 Patent"). Count VIII asserts that Apkudo infringes U.S. Patent No. 10,657,017 (the "'017 Patent").

The basis for this motion is that the asserted claims of the '973, '923, '488, and '017 Patents are invalid as a matter of law because each claim is ineligible subject matter under 35 U.S.C. § 101. Each claim fails both steps of the *Alice* framework: each is directed to an abstract idea, and none supplies an "inventive concept" that makes it "significantly more" than that idea. *See GoTV Streaming, LLC v. Netflix, Inc.,* 166 F.4th 1053, 1064-67 (Fed. Cir. 2026). Each claim merely recites broadly defined steps performed with generic computer hardware, software, and data components that are described purely by the functions they perform. Such claims are not eligible. *Two-Way Media Ltd. v. Comcast Cable Communications*, LLC, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (determining that the claims were directed to an abstract idea because the claim language required "the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records'" but did "not sufficiently describe how to achieve these results in a non-abstract way"); *GoTV Streaming*, at 1065 (claim "directed to the abstract idea of a template set of specifications" "that can be tailored (in at least one respect) for final production of the specified product" were directed to an abstract idea).

## A. The First Amended Complaint

Plaintiff filed its original Complaint on April 1, 2026 asserting infringement of six patents, including the '973 and '923 Patents in counts IV and V, respectively. Dkt. 1. Apkudo answered on

May 7, 2026. Dkt. 22. On August 28, 2026, Plaintiff filed its First Amended Complaint ("FAC"), adding infringement of the '488 Patent and '017 Patent as Counts VII and VIII, respectively. Dkt. 49, ¶¶ 134-147, 148-161. The FAC continues to assert infringement of the '973 and '923 Patents in counts IV and V, respectively. *Id.*, ¶¶ 92-105, 106-199.

The FAC has attached claim charts asserting claim 1 of the '973 Patent (Dkt. 49-10), claim 1 of the '923 Patent (Dkt. 49-11), claims 1, 3-5, 7, and 12-14 of the '488 Patent (Dkt. 49-15), and claims 1, 2, 4, 9, 10 and 15 of the '017 Patent (Dkt. 49-16).

### B. The Specification and Claim 1 of the '973 Patent

The 973 Patent generally describes "a system and method for detecting, tracking and removing customer private information (CPI) from electronic devices". Dkt. 49-4, at col. 3:13-15. According to the '973 Patent, the removal of CPI from these devices (such as "cell phones, PDAs, Smart phones, laptops, e-readers, mp3 players"), is necessary when consumers return their devices for "repairs, refurbishment, exchanges, warranty issues" or "otherwise recycled for usage." *Id.* at 1:45-48, 3:20-23, 44-47. It is necessary to remove "all personal information, sensitive data, or other information linked to a previous user" to comply with applicable laws, avoid potential identity theft and maintain customer privacy. *Id.* at 1:48-56.

The embodiments of the '973 Patent disclose the removal of CPI from electronic devices in the context of "warehouse management operations, returns or shipping systems logistics services, and systems and devices that are utilized to process electronic devices or other goods." *Id.* at 3:56-61.

Claim 1 of the 973 Patent is the only independent claim and recites:

> 1. A method for flashing an electronic device, the method comprising:
> establishing communication, by a computing device, with an electronic device, wherein the electronic device is in communication with the computing device using at least one of a wireless connection and a wired connection;

identifying, by the computing device, a make and model associated with the electronic device;

accessing, by a computing device, a flashing program stored on a network device; and

flashing, by the computing device, as instructed by the flashing program, the electronic device, wherein the flashing removes customer private information from the electronic device;

reporting the removal or non-removal of the customer private information on the electronic device to provide an audit trail;

performing trend analysis using the audit trail to identify issues with removing the customer private information from specific device types; and

reconfiguring the flashing program to more effectively remove the customer private information for future devices based on the identified issues.

*Id.* at 23:35-24:13.

As can be seen, claim 1 thus requires four hardware components, "an electronic device", "a computing device", "a network device", and "one of a wired and a wireless connection." *Id.* Claim 1 does not call for any unique structure or configuration for these hardware components. *See id.* Further, the '973 Patent specification describes these hardware components only generically or in terms of standard subcomponents, again, without any unique properties or structures. See *id.* at 3:44–47 (electronic device); 9:24–31 (the "computing device" is "a personal computing device, such as a desktop computer," or "a server or other network device"); 21:48–54 (computing device); 3:28–31 (network device); 10:29–32 (the network "may represent any number of public or private networks"); 12:43–45, 13:19–32, 14:53–56, 19:17–29, 21:54–58 (connection).

Claim 1 only recites one software component, "a flashing program", without any further unique detail or structure, other than its overall function and location. The specification likewise describes only generic components of the flashing program. *Id.* at 20:18-23, 29-41, 58-60.

Notably, three of the claimed steps for improving the flashing program – reporting the removal or non-removal of CPI, performing trend analysis to identify issues with removing CPI, and reconfiguring the flashing program based on those – may be performed entirely by an operator without using any of the claimed hardware or software components. *See id.,* at 23:35-24:13; 4:4-

5 ("The embodiments as herein described, may be automated or may require user interaction."); 8:62-64 ("The process flow 200 may include any number of users, participants, steps, and systems that may be automated or implemented based on user input.").

**C. The Specification and Claim 1 of the '923 Patent**

The '923 Patent generally describes "a system, method, and auditing device for processing electronic devices to detect customer personal information (CPI)." Dkt. 49-5, col. 3:52-54. As with the '973 Patent, the '923 Patent addresses consumers turning in their personal electronic devices returned "for repairs, refurbishment, exchanges, warranty issues, or any number of other justified or arbitrary reasons." *Id.* at 1:35-40. It is thus "imperative" that any personal data from the original user be cleared from the device to avoid violating laws and regulations and prevent identity theft. *Id.* at 1:40-49. The '923 Patent also discloses the use of a "number of libraries to detect CPI included on the one or more electronic devices" *Id.* at 3:62-64.

The asserted claim 1 of the '923 Patent recites:

1. An auditing device for detecting customer personal information (CPI), the auditing device comprising:
  a user interface for communicating information and receiving user input;
  a plurality of interfaces operable to communicate with one or more electronic devices;
  a memory operable to store a plurality of libraries providing information for detecting CPI on a plurality of electronic devices including a plurality of makes, models, and configurations; and
  logic operable to utilize the plurality of libraries to:
    detect, with the auditing device, CPI included on the one or more electronic devices communicating with the auditing device;
    record, at the auditing device, an identification of an electronic device in an audit trail in response to detecting that the CPI is present on the electronic device, wherein the audit trail includes data on other electronic devices in which the auditing device previously detected that the CPI was present;
    store, at the auditing device, an alert associated with the identification indicating that CPI is present on the electronic device;
    perform, at the auditing device, trend analysis on the audit trail to indicate potential issues;

> adjust, at the auditing device, the plurality of libraries to more effectively remove the CPI from electronic devices based on the trend analysis;
>
> update, with the auditing device, a second plurality of libraries of a CPI removal system by communicating with a master auditing device in response to adjusting the plurality of libraries stored in the memory of the auditing device; and
>
> remove, by the auditing device, the CPI included on an electronic device of the one or more electronic devices in response to determining that the CPI is present on the electronic device.

*Id.* at 18:12-48.

As can be seen, claim 1 recites that the auditing device has three generic computer hardware components: a user interface, a plurality of interfaces, and a memory. *Id.* at 18:14-21. The only details claimed for these hardware components are the functions they perform. *Id.* The function of the memory is its being "operable to store a plurality of libraries providing information for detecting CPI on a plurality of electronic devices including a plurality of makes, models, and configurations". *Id.* Other than providing information, there is no further recitation of any structure, property, or other detail concerning the "plurality of libraries". The claim then recites that the claimed auditing device has "logic operable to utilize the plurality of libraries" to perform a series of functions, "with" or "at" the auditing device: 1) <u>detect</u> CPI on electronic devices, 2) <u>record</u> "an identification of an electronic device in an audit trail" if CPI is detected and that audit trail data on other devices previously detected, 3) <u>store</u> an alert if CPI is detected, 4) <u>perform</u> a trend analysis on the audit trail, 5) <u>adjust</u> "the plurality of libraries to more effectively remove the CPI . . .based on the trend analysis, 6) <u>update</u> a second plurality of libraries . . . by communicating with a master auditing device", and 7) remove CPI if it has been detected. *Id.* at 18:12-48. Although claim 1 is drafted as an apparatus claim, that form is immaterial: a system claim that recites generic components performing an abstract method is "no different from the method claims in substance." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 226 (2014); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013).

The embodiments disclosed in the '923 Patent specification describe only standard computer hardware components. *See id.* at 9:32-42 (a graphical user interface), 10:48-51 (plurality of interfaces connecting to devices), 9:15-24 (memory). The specification describes possible contents for the plurality of libraries, but not their own software structure (e.g. a relational database). *See id.* at 10:5-14 (temporary applications to install on the devices), 10:20-47 (interface commands and scripts, the directory structure, and the baseline memory map for devices).

**D. The Specification and Claims of the '488 Patent**

As with the '973 and '923 Patents, the '488 Patent is concerned with the removal of CPI from consumer electronic devices that have been turned in for various reasons. Dkt. 49-13 at 1:31-44.[1] In this case the '488 Patent is concerned with testing whether CPI is present on an electronic device, locking the device during testing, removing the CPI if found, and then unlocking the device.

Claim 1 of the '488 Patent recites:

> 1. A method for processing electronic devices to remove customer personal information (CPI), the method comprising:
>
> establishing a connection between an electronic device and a test system;
>
> testing, by the test system, the electronic device to determine the presence of the CPI utilizing a library associated with a make and model of the electronic device;
>
> locking, by the test system, functionality of the electronic device in response to initiating the testing;
>
> retrieving, by the test system, the library through a network connection in response to determining, by the test system, that the library is not locally available to the test system;
>
> generating, by the test system, a report indicating whether the electronic device includes the CPI;
>
> processing, by the test system, the electronic device for distribution to one or more locations in response to determining, by the test system, whether the CPI is present on the electronic device, wherein processing the electronic device includes attempting to

[1] The '488, '973 and '923 Patents originate from the same application, No. 12/940, 346, from which the '488 Patent stemmed directly, the '973 Patent application was a continuation-in-part and the '923 Patent application was a divisional. Dkts. 49-4, 49-5 and 49-13 (first pages).

> remove the CPI from the electronic device in response to a determination that the electronic device includes the CPI, verifying that the CPI is removed from the electronic device in response to the attempt to remove the CPI; and
>
> activating, by the test system, the functionality of the electronic device in response to verifying that the CPI has been removed from the electronic device.

Dkt. 49-13 at 17:56-18:17.

Dependent Claims 3, 4, 5, 7, and 12-14, add extra limitations: (3) the electronic device is received for return, repair, recycling, or refurbishment, (4), the report is communicated to a service provider associated with the electronic device, (5) the report is communicated to a party responsible for removing the CPI from the electronic device, (7) .auditing the electronic device for addition and removal of the CPI from the electronic device while in possession of an organization, (12) comprising testing, by the test system, a plurality of electronic devices concurrently, (13) the plurality of electronic devices consist of different makes and model of electronic devices, and (14) testing further comprises: determining an identifier associated with the electronic device, determining the make and model of the electronic device; and retrieving the library associated with the make and model. *Id.* at 18:22-63.

The claims recite only two hardware components—a "connection" and a "test system"—and three software or data components: a "library", a "report" and an "identifier". *Id.* The claims include no details about these components other than their functions. *See id.* The claim likewise provides no details on ***how*** any of the purely functional steps are performed. *See id.*

Nothing in the claim requires the "test system" to be anything more than a general-purpose computer. *Id.* Further, the specification discloses an embodiment in which the device that performs the claimed testing "is a personal computing device, such as a desktop computer," or "a server or other network device." *Id.* at 8:36-43. Nor do the claims require that the testing, reporting, verification, auditing, determining, and retrieving steps be automated; the specification

states that "[t]he embodiments as herein described, may be automated or may require user interaction." *Id.* at 3:41–42.

**E. The Specification and Claims of the '017 Patent**

The '017 Patent is generally directed to computer-implemented methods and systems to "service" an electronic device. Dkt. 49-14 at col. 1:44-47. The device could be a smartphone, tablet or PDA and the service could include removing CPI, re-configuring hardware, software, and/or firmware running on the electronic device, and/or installing new software and/or firmware on the electronic device." *Id.* at 1:15-20. The specification further notes that the system or method must account for the fact that "different makes and device models of electronic devices may have conflicting setup procedures and may require different hardware components to configure the respective electronic devices." *Id.* at 1:33-36.

Claim 1 of the '017 Patent recites:

> 1. A computer-implemented method to service an electronic device, the method comprising:
>
> receiving a request to service a first electronic device communicatively connected to a first test station;
>
> obtaining a device model and an image group of the first electronic device, each image group being associated with one or more different device models;
>
> determining criteria for servicing the first electronic device in accordance with a first desired setup, the criteria being based on the device model of the first electronic device;
>
> receiving at least one of a first virtual hard drive having an image of one or more applications compatible with the image group of the first electronic device; and
>
> executing a first set of the one or more applications to service the first electronic device in accordance with the first desired setup.

*Id.* at 20:2-19. Dependent claims 2 and 4 recite:

> 2. The computer-implemented method of claim 1, wherein determining the criteria for servicing the first electronic device in accordance with the first desired setup comprises determining at least one of criteria for servicing the first electronic device based on the device model of the first electronic device, a destination of the first electronic device, a device use condition of the first electronic device, a device repair condition of the first electronic device, and a technician specified criterion of the first electronic device.

4. The computer-implemented method of claim 1, further comprising:
receiving a request to service a second electronic device communicatively connected to the first test station;
obtaining a device model and an image group of the second electronic device; and
executing the first set of the one or more applications to service the second electronic device in accordance with the first desired setup if the device model of the first electronic device and the device model of the second electronic device are identical.

*Id* at 20:28-51.

Independent claim 9 is a system claim with "a processor operable to" perform the same steps called for in claim 1. *Id* at 21:47-65. Claim 10 depends from and recites:

10. The system of claim 9, wherein the processor is further operable to:
determine a number of test stations belonging to a first group of test stations, wherein each test station of the first group of test stations is utilized to service at least one electronic device that is associated with a first image group;
determine a number of virtual hard drives belonging to a first set of virtual hard drives, wherein each virtual hard drive of the first set of virtual hard drives stores a copy of a first image, and wherein the first image is an image of one or more applications utilized to service the at least one electronic device; and
dynamically request the number of the first set of virtual hard drives to be readjusted based on a first ratio, wherein the first ratio is a ratio of the number of test stations belonging to the first group of test stations relative to the number of the first set of virtual hard drives.

*Id* at 21:48-22:17.

Claim 15 recites a "non-transitory machine-readable medium" with instructions that, when executed, cause one or more processors to perform the same steps as those called for in claims 1 and 9. *Id.* at 23:5-24.

The asserted claims call for software or data components that the claims themselves do not define or provide detail for, except for the functions they perform: one or more "image group", "a first desired setup", and "virtual hard drives", and "an image of one or more applications". *See id.*

The '017 Patent specification does not provide direct definitions for these software or data components, nor does it disclose embodiments with details of the components themselves.

Rather, the specification only discusses them in terms of how they are used. The specification uses the term “image” to refer to an executable copy of a software application that can be placed and run on an electronic device to “service” it. *See Id.* at 1:57-60, 3:3-7, An “image group” functions as a list or index of applications that are compatible with one or more makes and models of devices that are being serviced *See id.* at 4:12-39. A “desired set up” provides information that can be used to set up a test station to perform a specific kind of service in a way that is compatible with a particular make and model, or a group of makes and models. *Id.* 1:32-39, 1:52-56, 2:38-44. The “virtual hard drive” is used as some as unspecified computer memory containing copies or “images” of at least one application that will be placed onto and run on a device by the test station to perform service on that device. *Id.* at 4:44-48, 6:45-47.

## II. LEGAL STANDARD

### A. Motions to Dismiss

Fifth Circuit law governs the procedural standards applicable to a motion under Rule 12. *See Disc Disease Sols. Inc. v. VGH Sols., Inc.,* 888 F.3d 1256, 1259 (Fed. Cir. 2018) (citation omitted). Rule 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for “failure to state a claim upon which relief can be granted.” Fed. R. Civ. Pro. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must plead “enough facts to state a claim to relief that is plausible on its face.” *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). “Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering whether the plaintiff has stated a claim, courts must “accept all factual allegations in the complaint as true” and “draw all reasonable inferences in the plaintiff's favor.” *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).

"The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss." *Rio Grande Royalty Co v. Energy Transfer Partners, L.P.,* 620 F.3d 465, 468 (5th Cir. 2010) (citing *Briggs v. Mississippi,* 331 F.3d 499, 508 (5th Cir. 2003)). Because eligibility turns on the claims and the specification rather than on facts a plaintiff could add by amendment, courts routinely dismiss ineligible claims with prejudice. *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1215–16 (Fed. Cir. 2025) (affirming dismissal with prejudice where patentee "failed to propose any amendments or identify any factual issues" that would change the result); *Authentixx LLC v. Pickleball OpCo LLC*, No. 3:25-CV-1599-B, 2026 WL 1847456 at * 10 (N.D. Tex. June 26, 2026) (Boyle, J.) (dismissing ineligible claims with prejudice).

Federal Circuit law applies to all "substantive issues of patent law." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt*., LLC, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (citation omitted).[2]

### B. The Two-Step "*Alice*" Analysis for Patent Eligibility Under Section 101

"Patent eligibility under 35 U.S.C. § 101 is a question of law that may involve underlying questions of fact." *Constellation Designs, LLC v. LG Elecs. Inc.*, No. 2024-1822, 2026 WL 2561781, at *6 (Fed. Cir. Aug. 31, 2026) ("*Constellation*") (citing *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1342 (Fed. Cir. 2018)). "To determine whether a patent claim is ineligible subject matter, the Supreme Court has established a two-step framework." *Id.* First, the court "must determine whether the claims at issue are directed to a patent-ineligible concept such as an

[2] To the extent Rule 12(b)(6) is procedurally unavailable as to Count IV, since Apkudo answered before Plaintiff filed the FAC, Apkudo respectfully requests that the Court construe this motion as one for judgment on the pleadings under Rule 12(c). The same Rule 12(b)(6) standard governs a Rule 12(c) motion challenging the sufficiency of the pleadings. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

abstract idea." *Id.* (citing *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014)). "Second, if the claims are directed to an abstract idea, we must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (citing *Alice*, which, in turn, cites *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79 (2012)). "To transform an abstract idea into a patent-eligible application, the claims must do 'more than simply stat[e] the [abstract idea] while adding the words 'apply it.'" *Alice*, 573 U.S. at 221 (second alteration in original) (quoting *Mayo*, 566 U.S. at 72).

**1. *Alice* Step One**

"'*Alice* step one presents a legal question that can be answered based on the intrinsic evidence,' including the patent's specification and claims." *Constellation, supra,* 2026 WL 2561781 at *7 (citing *CardioNet, LLC v. InfoBionic, Inc., 955 F.3d 1358, 1372–74* (Fed. Cir. 2020).

At *Alice* step one, "it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (quoting *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016)). For computer-related inventions, the step one analysis asks "whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).

> On one side of the line (requiring a determination favoring the patent challenger at step one) are claims that simply call for the use of computers and networks as tools to carry out an abstract idea, using their ordinary functions without specific hardware or process advances in those functions—e.g., receiving inputs, storing and retrieving, processing, outputting (including displaying), and transmitting. On the other side of the line (ending the Alice inquiry, without proceeding to step two) are claims that call for a concrete asserted improvement in ***how*** those functions are

> carried out, which requires more than result-focused functional language and more than just using those functions in the context of specifically identified content.

*GoTV Streaming, LLC v. Netflix, Inc.,* 166 F.4th 1053, 1064 (Fed. Cir. 2026) (emphasis in original); *see also Sanderling, supra,* 65 F.4th at 703 (when patent claims "are not directed to a specific improvement in computer functionality but, instead, to the use of computers as a tool", those claims are directed to abstract ideas).

**2. *Alice* Step Two**

At *Alice* step two, the inquiry is into whether the claims recite matter that is "an inventive concept that renders a claim 'significantly more' than an abstract idea to which it is directed." *GoTV Streaming*, 166 F.4th at 1067 (quoting *BSG Tech LLC v. Buyseasons, Inc.,* 899 F.3d 1281, 1290 (Fed. Cir. 2018)). The claim "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]. *Constellation*, 2026 WL 2561781, at *8 (quoting *Alice*, 573 U.S. at 217). The claim elements must be considered "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* "These additional features cannot simply be 'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* "Instead, the inventive concept must be 'sufficient to ensure that the patent in practice amounts to significantly more' than a patent on the abstract idea." *Id.*

> In conducting the step-two inquiry, we have repeatedly emphasized that it is not sufficient, in order to pass muster, for a claim to use functional, result-focused language or to encompass ordinary computers and networks to perform their ordinary functions in carrying out an abstract idea, even when narrowed to a particular use or environment (such as particular subject matter), without going further to require a specific implementation to improve ***how*** those functions are carried out.

*GoTV Streaming,* at 1064 (emphasis in original).

### C. Eligibility Is Properly Decided on the Pleadings, and No Claim Construction Is Required

Section 101 eligibility may be resolved on a Rule 12(b)(6) motion where "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Further, claim construction "is not an inviolable prerequisite to a validity determination under § 101." *Sanderling*, 65 F.4th at 704 (affirming Rule 12(b)(6) dismissal) (quoting *Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Can. (U.S.),* 687 F.3d 1266, 1273 (Fed. Cir. 2012)). "If claims are directed to ineligible (or eligible) subject matter under all plausible constructions, then the court need not engage in claim construction before resolving a Section 101 motion." *Id.*. "In aid of determining whether a particular motion requires claim construction before disposition of the motion, a district court is free to require the party asking for construction to provide an actual proposed construction, to demonstrate that its construction is not frivolous, and to articulate how adoption of the construction would materially impact the analysis at step one (and/or at step two)." *Id.*

## III. COUNTS IV, V, VII, AND VIII OF THE FAC SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THE ASSERTED PATENT CLAIMS RECITE INELIGIBLE SUBJECT MATTER UNDER § 101

### A. The '973 Patent Claims Ineligible Subject Matter (Count IV)

#### 1. Claim 1 of the '973 Patent is Directed to An Abstract Idea

Claim 1 of the '973 Patent is directed to a method of using of a "flashing program" to remove customer CPI from "electronic devices" and improving the removal of CPI by reporting results of the removal, providing an audit trail, performing trend analysis using that audit trail and then reconfiguring the flashing program "to more effectively remove" the CPI for future devices. *Dkt.* 49-4 at 23:35-24:13 (*see* Section II.A, *supra*). Notably, claim 1 provides no

further details concerning the flashing program, how any of the steps are performed, nor what "reconfiguring the flashing program" entails. *See id.*

As also noted above, the distinction between an abstract and non-abstract idea in a computer related invention is whether the claims are directed to merely "the use of computers as a tool" or whether they are "directed to a specific improvement in computer functionality." *Sanderling, supra,* 65 F.4th at 703; *GoTV Streaming, supra,* 166 F.4th at 1064.

In *Constellation*, the Federal Circuit used this distinction between claims directed to mere abstract ideas and those directed to improvements in ***how*** a system functions to find one set of claims ineligible and another set not. The patents there concerned signal "constellations" used to reduce decoding errors in digital broadcasting. *Id.* at *2–3.

The court then divided the representative claims into two groups: "optimization claims" and "constellation claims". *Id.* The court then found that the optimization claims were abstract as ineligible because "the [representative] claim is directed to the abstract idea of 'optimizing' a constellation for PD capacity." *Id.* at *8. The court found, on the other hand, that the constellation claims were not abstract:

> Instead of claiming the abstract idea of "optimizing" a constellation for capacity without limiting the optimization to any meaningful process or any constraints, the constellation claims are directed to "specific constellations" that the inventors developed using the techniques described in the specifications.

*Id.* at *9.

Like the invalid "optimization claims" in *Constellation*, claim 1 of the '973 patent is directed to the mere abstract idea of improving the effectiveness of a flashing program, using the generic steps of reporting results, analyzing them for trends, and then reconfiguring the flashing program, "without limiting the [reconfiguring] to any meaningful process or any constraints". *Dkt.* 49-4 at 23:35-24:13; *Constellation* at *8. Unlike the valid "constellation claims", Claim 1 is ***not***

directed to any ***specific*** hardware components, any ***specific*** flashing program, or any ***specific*** ways for reporting, performing trend analysis, or reconfiguring the flashing program. *See id.* at *9. In other terms, Claim 1 is directed to an abstract idea because it uses "purely result-focused functional language, containing no specificity about how the purported invention achieves those results." *See GoTV Streaming*, 166 F.4th at 1064 (quoting *Beteiro, LLC v. DraftKings Inc*., 104 F.4th 1350, 1356(Fed. Cir. 2024), ).

The Federal Circuit has consistently found claims reciting a computer system performing multiple tasks in using, manipulating, and analyzing software applications and data to be ineligible. In *GoTV Streaming,* for example, the claims called for the steps of 1) "receiving . . . a request for an application program, 2) "executing . . .said application to generate a wireless device generic template including a plurality of content items", 3) "sending a custom configuration to the wireless device, said custom configuration being specific to said application program", 4) "generating a page description based on said wireless device generic template and a capability of the wireless device, said page description having at least one discrete low level rendering command that is within said rendering capability of said wireless device but that is of a syntax that is wireless device generic;" and 5) "sending said page description to the wireless device such that the wireless device is capable of presenting at least one content item from said plurality of content items using both said page description and said custom configuration." *Id.* at 1058. The court then characterized this claim as being directed to the abstract idea of "using a template for tailoring the final set of specifications the device uses to put an image on the screen, with use of the ordinary capacity of computers (including a given wireless device) and networks to aid (in automating or speeding up, e.g.) that process." *Id.* at 1066. The court then concluded "the terms . . ., notwithstanding any first-blush appearance of technical specificity, have broad meanings that, individually and taken

together, cannot support a conclusion that the claim is directed to a concrete computer/network advance." *Id.* The court then contrasted the claims in the case *Visual Memory LLC v. NVIDIA Corp.,* 867 F.3d 1253 (Fed. Cir. 2017), in which the claims "were specifically about the characteristics of a computer's memory system, assertedly creating an improvement in this basic component of a computer, . . ."

In the present case, the claims "notwithstanding any first-blush appearance of technical specificity" are not directed to any "improvement in this basic component of a computer", but instead simply to using a generic computer to perform function. *See id.*

This Court has applied the same distinction. Where a claim improves the *efficiency* of a process—here, how "effectively" CPI is removed—rather than the functionality of the computer that performs it, it is directed to an abstract idea. *Magnacross LLC v. OKI Data Ams., Inc.*, No. 3:20-cv-01959-M, 2022 WL 992595, at *7 (N.D. Tex. Mar. 31, 2022) (Lynn, C.J.); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015). Claim 1 promises only that the flashing program will be reconfigured "to more effectively remove" CPI. It claims the goal, not a means of reaching it.

Further, the steps of reporting results from the running of a program, analyzing those results, and then reconfiguring that program to be more effective describe the ordinary feedback loop of any quality-control process: record the outcome, look for patterns, and adjust. Nothing about that practice is specific to computers, and nothing in claim 1 changes how a computer performs it. *See GoTV Streaming, supra,*166 F.4th at 1064 ("we have often recognized claims directed to 'a longstanding or fundamental human practice' to be directed to an abstract idea").

Finally, there is no detail in claim 1 that would limit these reporting, analyzing, and reconfiguring steps from being conducted mentally or on paper (or email or spreadsheet, etc.). *See*

*Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361-62 (Fed. Cir. 2023) ("A telltale sign of abstraction is when the claimed functions are mental processes that can be performed in the human mind or using a pencil and paper.") (internal quotation marks omitted) (quoting *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021)); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372–73 (Fed. Cir. 2011). Claim 1 of the '973 Patent is thus clearly directed to a mere abstract idea.

**2. Claim 1 of the '973 Patent Does not Include an "Inventive Concept" or Anything "Significantly More" Than an Abstract Idea**

The Federal Circuit has recognized that the *Alice* step-two inquiry "often overlaps with the step-one inquiry, and as a practical matter, few of our cases have involved a determination favoring the patent owner at step two after a determination favoring the challenger at step one." *GoTV Streaming,* at 1067 (citations omitted). This stems from the fact that any alleged "inventive concept" in such claims often consists in "the abstract idea itself". *Constellation*, at * 9.

As just noted, claim 1 merely recites 1) generic, well known, hardware components – a "computing device", a "network device" and a "connection" – 2) a software component only described by its function – a "flashing program" that removes CPI – and 3) a set of broadly claimed steps to improve the flashing program that do not recite ***how*** those steps are performed. *See Dkt.* 49-4 at 23:35-24:13. Thus, any "inventive concept" that could be alleged in claim 1 could only consist of the same abstract "functional, result-focused language" that only "encompass[es] ordinary computers and networks to perform their ordinary functions in carrying out an abstract idea" and without "going further to require a specific implementation to improve how those functions are carried out." *See GoTV Streaming,* at 1067; *BSG Tech LLC, supra.,* 899 F.3d at 1290–91 ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-

eligible application of an abstract idea."). Again, because claim 1 fails to provide any further details for its generic hardware components, the "flashing program" or, most importantly, ***how*** reconfiguring the flashing program is accomplished, it cannot include an "inventive concept" beyond its mere abstract idea. *See Constellation*, at * 9.

The specification confirms that each component is conventional. The "computing device" is "a personal computing device, such as a desktop computer," or "a server or other network device"; the network "may represent any number of public or private networks"; and the logic that performs the process "may be operable [to] operate automatically or autonomously with or without user input." Dkt. 49-4 at 9:24–31, 10:10–12, 10:29–32. A patentee cannot create a factual dispute at step two by alleging that components its own specification describes as generic are unconventional. *Beteiro*, 104 F.4th at 1357. Considered as an ordered combination, the steps—connect, identify, retrieve the program, run it, record the result, analyze the records, adjust—are arranged in the only order in which such a process could be performed, and the combination "ad[ds] nothing . . . that is not already present when the steps are considered separately." *Alice*, 573 U.S. at 225 (quoting *Mayo*, 566 U.S. at 79); see *Two-Way Media*, 874 F.3d at 1339.

### B. The '923 Patent Claims Ineligible Subject Matter (Count V)

#### 1. *Alice* Step One

Claim 1 of the '923 Patent fails both *Alice* steps for many of the same reasons as the asserted claim of the '973 Patent. Like the invalid "optimization claims" in *Constellation*, claim 1 of the '923 patent is directed to the purely abstract idea of improving the effectiveness of CPI removal through the performance of broadly defined steps: record an "audit trail" relating to the detection of CPI on devices, perform a "trend analysis" on the audit trail to indicate "issues", and then "adjust" the "plurality of libraries to more effectively remove the CPI". Dkt. 49-5 at 18:12–48; *Constellation*, 2026 WL 2561781, at *8; see Section II.C, *supra*. The claim recites no structure

or detail for any of the generic hardware components nor for the software and data components – the "libraries", "audit trail" or "trend analysis" – i.e., precisely what data are contained in them and in what form. *See* Dkt. 49-5 at 18:14-21. Most importantly, the claim fails to specify ***how*** the plurality of libraries is adjusted to increase effectiveness. *Id.*; *GoTV Streaming*, 166 F.4th at 1064. Thus, claim 1 of the '923 Patent is directed to an abstract idea because it recites "purely result-focused functional language, containing no specificity about how the purported invention achieves those results." (*See GoTV Streaming*, at 1064) and is merely directed to "the use of computers as a tool" for performing the claimed functions and not "directed to a specific improvement in computer functionality." *Sanderling, supra,* 65 F.4th at 703; *GoTV Streaming, supra,* 166 F.4th at 1064. The fact that claim recites a number of specific steps in performing its function does not save it from being abstract. *See Two-Way Media Ltd. v. Comcast Cable Communications*, LLC, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (determining that the claims were directed to an abstract idea because the claim language required "the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records'" but did "not sufficiently describe how to achieve these results in a non-abstract way").

A close analogy are claims that purport to improve virus screening, which the Federal Circuit has held abstract in precisely this form. In *Intellectual Ventures I LLC v. Symantec Corp.*, claims to screening data against a stored set of characteristics, flagging matches, and updating the stored characteristics were held directed to an abstract idea, because screening items against a list of known characteristics is a long-prevalent human practice that a computer merely performs faster. 838 F.3d 1307, 1316–20 (Fed. Cir. 2016). Claim 1 of the '923 Patent is that idea with the word "virus" replaced by "CPI": "libraries" of information for detecting CPI stand in for virus definitions; "detect[ing]" CPI on a connected device is the scan; the "audit trail" and "alert" are

the log; and "adjust[ing]" the libraries and "updat[ing] a second plurality of libraries" through a "master auditing device" is the distribution of updated definitions from a central server. None of it is an improvement in how a computer detects or removes anything.

**2. *Alice* Step Two**

As with the '973 Patent, since claim 1 of the '923 Patent entirely consists of an abstract idea, none of the elements, either individually or "in an ordered combination" can constitute an "inventive concept" to pass *Alice* step two. See *Constellation*, 2026 WL 2561781, at *9; *GoTV Streaming*, 166 F.4th at 1067; *BSG Tech*, 899 F.3d at 1290–91. The specification describes every recited component generically—the auditing device is "a personal computing device, such as a desktop computer," its memory "may use any type of volatile or non-volatile storage," and its interfaces are a graphical user interface and ordinary device connections, Dkt. 49-5 at 9:15–24, 9:32–42, 10:48–51. Again, the mere fact of performing multiple steps of manipulating data and software does not provide an "inventive concept. *GoTV Streaming*, at 1066-67; *Two-Way Media*, 874 F.3d at 1339.

**C. The '488 Patent Claims Ineligible Subject Matter (Count VII)**

As noted above, the asserted claims of the '488 Patent are directed to the abstract idea of detecting and removing CPI from a device using a library specific to that device, verifying CPI removal and then distributing the device based on the detection, removal, and verification. (*See* Section I.D., *supra*). The dependent claims only add functional details. *Id.* Again, the claims recite only two hardware components—a "connection" and a "test system" –and three software or data components: a "library", a "report" and an "identifier". Dkt. 49-13 at 17:56-18:62. The claim includes no details about these components other than their functions. *See id.* The claims likewise provide no details on ***how*** any of the purely functional steps are performed. See *id.*; *GoTV Streaming*, 166 F.4th at 1064. The claims are thus "directed to generalized steps to be performed

on a computer using conventional computer activity [which] are not patent eligible." *Two-Way Media*, 874 F.3d at 1337; *Sanderling*, 65 F.4th at 703; *GoTV Streaming*, 166 F.4th at 1064-66.

Finally, the claims of the '488 Patent would fail the *Alice* step-two inquiry because the entirety of the claims is directed to an abstract idea and thus cannot supply an "inventive concept" that is not also abstract. See *Constellation*, 2026 WL 2561781, at *9; *GoTV Streaming*, 166 F.4th at 1067; *BSG Tech*, 899 F.3d at 1290–91. The "test system" is, by the specification's own account, "a personal computing device, such as a desktop computer," (Dkt. 49-13 at at 8:36-43); the "library" is described only by what it contains; and the FAC alleges nothing further about either. See Dkt. 49 ¶¶ 106-199.

**D. The '017 Patent Claims Ineligible Subject Matter (Count VIII)**

Claim 1 is directed to the abstract idea of servicing an electronic device through the operation of an application placed onto that device and that 1) is capable of performing the desired service, and 2) compatible with the device model. *See* Dkt. 49-14 at 20:2-19. To accomplish this function, the claim recites software or data components that are only defined by their function: "an image group", "a first desired setup", "a first virtual hard drive", and "an image of one or more applications". *See Id.* The claim does not provide any detail about the structure of these components and, most importantly, does not specify ***how*** any of the claimed functions are performed with these components. See *id.*; *GoTV Streaming*, 166 F.4th at 1064. The claims are thus "directed to generalized steps to be performed on a computer using conventional computer activity [which] are not patent eligible." *Two-Way Media*, 874 F.3d at 1337; *Sanderling*, 65 F.4th at 703; *GoTV Streaming*, 166 F.4th at 1064-66.

In the same way, claim 1 of the '017 Patent would fail the *Alice* step-two inquiry because the entire claim is directed to an abstract idea and thus cannot supply an "inventive concept" that is not also abstract that employs convention hardware and software components to implement

generalized functions. The claims "notwithstanding any first-blush appearance of technical specificity" are not directed to any "improvement in this basic component of a computer", but instead simply to using a generic computer to perform function. *See GoTV Streaming*, 166 F.4th at 1067; *see also Constellation*, 2026 WL 2561781, at *9; *BSG Tech*, 899 F.3d at 1290–91.

## IV. CONCLUSION

For the reasons stated above, Defendant Apkudo, Inc. respectfully requests that the Court grant its Partial Motion to Dismiss, dismiss Counts IV, V, VII, and VIII of Plaintiff's First Amended Complaint with prejudice for failure to state a claim upon which relief can be granted, and deny leave to amend as futile.

Date: September 18, 2026

Respectfully submitted,

*/s/ Eliyahu Ness*
Eliyahu Ness
NESS PLLC
TX Bar No. 24119651
eness@nesslegal.com
David Gamble
TX Bar No. 24040946
dgamble@nesslegal.com
3232 McKinney Avenue, Suite 500
Dallas, TX 75204
Tel: (469) 319-1355

John Fargo (*pro hac vice*)
jfargo@nesslegal.com
Alexis White (*pro hac vice*)
awhite@nesslegal.com
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (305) 359-7401

Shaun Gregory (*pro hac vice*)
CHERRY JOHNSON SIEGMUND JAMES PLLC
sgregory@cjsjlaw.com

**COUNSEL FOR DEFENDANT, APKUDO, INC.**

**CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on September 18, 2026.

*/s/ Eliyahu Ness*
Eliyahu Ness